IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENDO PHARMACEUTICALS INC.<br>100 Endo Blvd.<br>Chadds Ford, PA 19317,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. FOOD AND DRUG<br>ADMINISTRATION<br>10903 New Hampshire Ave.<br>Silver Spring, MD 20993<br><br>　　　　　and<br><br>MARGARET A. HAMBURG, M.D.<br>Commissioner of Food and Drugs<br>U.S. Food and Drug Administration<br>10903 New Hampshire Ave.<br>Silver Spring, MD 20993<br><br>　　　　　and<br><br>KATHLEEN SEBELIUS<br>Secretary of Health and Human Services<br>200 Independence Ave., S.W.<br>Washington D.C., 20210,<br><br>　　　　　Defendants. | Civil Action No. _____ |

## COMPLAINT FOR MANDATORY, DECLARATORY, AND INJUNCTIVE RELIEF

Plaintiff, Endo Pharmaceuticals Inc. ("Endo"), for its Complaint against Defendants – the U.S. Food and Drug Administration, Margaret A. Hamburg, M.D., and Kathleen Sebelius (collectively, "FDA") – alleges as follows:

**NATURE OF ACTION**

1.     This case is an action in the nature of mandamus and for declaratory and injunctive relief, challenging FDA's unlawful failure to determine in a timely fashion whether the original non-crush-resistant formulation of Endo's opioid extended-release pain reliever, Opana® ER ("Original Formulation"), was withdrawn from sale by Endo for safety reasons involving the product's vulnerability to misuse and abuse.  The current formulation of Opana® ER is designed to be crush resistant ("Opana® ER CRF"), and thus offers significant safety advantages over the Original Formulation.  Endo seeks a declaratory judgment concluding that FDA violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), FDA's regulations, and the Administrative Procedure Act ("APA") by failing to decide in a timely manner that the Original Formulation was withdrawn from sale for safety reasons.   The Court should issue a preliminary injunction ordering FDA to make such a decision in an expeditious manner and no later than December 31, 2012; and further ordering that, in the interim, FDA must withdraw or suspend the approval of any Abbreviated New Drug Application ("ANDA") which cites the Original Formulation as its Reference Listed Drug ("RLD").

2.     FDA approved the Original Formulation of Opana® ER (New Drug Application "NDA" No. 21-610) on June 22, 2006, and Endo launched Original Formulation Opana® ER in July 2006.  In recognition of increased reports of the potential for abuse and misuse of Original Formulation Opana® ER, Endo invested significant resources in developing and implementing technology that would reduce the abuse and misuse of Opana® ER.  Some five years later, in December 2011, FDA approved Endo's Opana® ER CRF (NDA No. 201655).  Endo brought Opana® ER CRF to market in February 2012.

3.      On May 31, 2012, Endo notified FDA that it had discontinued Original Formulation Opana® ER, which was susceptible to misuse and abuse (most frequently by crushing and snorting the pills), for reasons of safety.  Endo advised FDA that Opana® ER CRF offered safety advantages over the Original Formulation in that Opana® ER CRF was designed to be resistant to crushing, and thus was substantially less susceptible to misuse and abuse.

4.      A drug manufacturer seeking FDA approval for a new (generic) version of an approved drug submits to FDA an ANDA which refers to an approved drug (the RLD) to establish the new drug's safety and effectiveness.

5.      The FDCA requires FDA, *sua sponte*, to withdraw or suspend approval of any ANDA when the RLD upon which the application is based "has been withdrawn from sale for safety . . . reasons."  21 U.S.C. § 355(j)(6).  FDA's regulations require the agency to suspend approval of an ANDA where FDA determines "that the abbreviated application is suspended because the listed drug on which the approval of the abbreviated new drug application depends has been withdrawn from sale for reasons of safety . . ." 21 C.F.R. § 314.153(a)(3).  FDA's regulations allow FDA to determine "whether a listed drug that has been voluntarily withdrawn from sale was withdrawn for safety or effectiveness reasons . . . at any time after the drug has been voluntarily withdrawn from sale," but FDA's determination "*must* be made" (again, *sua sponte*) before "approving an abbreviated new drug application that refers to the listed drug" or "[w]henever a listed drug is voluntarily withdrawn from sale and abbreviated new drug applications that referred to the listed drug have been approved."  21 C.F.R. § 314.161(a)(1), (2) (emphasis added).[1]

---

[1]      Pursuant to 21 U.S.C. § 355(e), FDA must withdraw approval of an NDA or ANDA, after giving the applicant notice and an opportunity to be heard.

6.     The safety determination FDA is required to make here is whether Original Formulation Opana® ER CRF was withdrawn from sale for reasons of safety.     This determination is straightforward and non-controversial because it is entirely consistent with FDA's mission to protect the public health and safety.   Making this determination is also consistent with FDA's public statements that it expects pharmaceutical companies to develop "novel interventions" to prevent opioid abuse, while continuing to permit these important drugs to be prescribed to millions of chronic pain sufferers in this country.   Endo, a pharmaceutical company heavily regulated by FDA, has done as the agency has requested and invested significant time and significant sums to develop a novel abuse-deterrent opioid formulation – Opana® ER CRF.

7.     FDA was required to make the withdrawn-for-safety determination after receiving Endo's May 31, 2012 notice that Original Formulation Opana® ER had been discontinued.   That determination should have been made *promptly* because FDA had by then already approved Impax Laboratories, Inc.'s ("Impax") ANDA No. 079087 to market generic versions of all Opana® ER strengths.   FDA had also approved Actavis South Atlantic LLC's ("Actavis") ANDA No. 079046 to market generic versions of the 7.5 and 15 mg Opana® ER strengths.

8.     FDA was required to make a safety determination *sua sponte* and yet failed to do so in the weeks and months following Endo's May 2012 notice of withdrawal of the Original Formulation. Endo therefore submitted a Citizen Petition on August 10, 2012, which was received by FDA on August 13 (a copy of which is attached to Plaintiff's contemporaneously filed Motion for Preliminary Injunction Declaration of T. Chapman ("Chapman Dec.") as Ex. C), formally asking FDA to:

1)     Determine that the discontinued, non-crush-resistant version of Opana® ER approved under NDA 021610 was discontinued for

reasons of safety and can no longer serve as an RLD for an ANDA
applicant;

2)   Refuse to approve any pending ANDA for a generic version of the
non-crush-resistant version of Opana® ER approved under NDA
No. 02160; and

3)   Suspend and withdraw the approval of any ANDA referencing
Opana® ER approved under NDA No. 021610 as the RLD.

9.     Endo later filed a second Citizen Petition and then supplemented its initial
Petition.   Nevertheless, FDA has failed to make the legally required withdrawn-for-safety
determination regarding Original Formulation Opana® ER despite: formal notification by Endo
in May; related Citizen Petition filings by Endo; mounting evidence of the public health crisis
caused by abuse and misuse of prescription opioid pain relievers; FDA's awareness that opioid
pain relievers that are manufactured without safety features are more susceptible to abuse;
FDA's exhortations to pharmaceutical companies to invest in innovative crush-resistant
formulations of opioid pain relievers; Endo's data demonstrating the safety benefits of Opana®
ER CRF over non-crush-resistant versions of the drug; the documented "squeezing-the-balloon
effect," whereby opioid abusers can be expected to quickly learn of and migrate to generic non-
crush-resistant formulations, *i.e.*, those pills that may be readily crushed and snorted; and FDA's
knowledge that a non-crush-resistant generic version of Opana® ER is poised to launch on or
about January 1, 2013.

10.     FDA's failure to make the required determination constitutes judicially
reviewable final agency action as FDA has unlawfully withheld or unreasonably delayed in
making a determination it is required to make.   Judicial intervention is particularly appropriate
and necessary here because FDA's inaction poses a risk to public health.   FDA has acted and

continues to act in an arbitrary and capricious manner, and it has abused its discretion by failing to make the required determination.

11.     Accordingly, in light of the looming January 1, 2013 deadline on which a generic manufacturer may flood the market with non-crush-resistant generic Opana® ER, this Court should order FDA to make a determination as to whether Original Formulation Opana® ER was withdrawn for safety reasons *by no later than December 31, 2012*.  Further, the Court should order that, until FDA makes a determination as to whether Endo discontinued the sale of Original Formulation Opana® ER for safety reasons, the agency must suspend approval of any ANDAs referring to Original Formulation Opana® ER and not approve any additional ANDAs referring to Original Formulation Opana® ER.

## PARTIES

12.     Plaintiff, Endo, a pharmaceutical company with expertise in pain management, is a Delaware corporation with its principal place of business in Chadds Ford, Pennsylvania.  Endo holds a new drug application for Original Formulation Opana® ER (NDA No. 21-610) and a separate approved NDA for Opana® ER CRF (NDA No. 201655).

13.     Defendant FDA is an agency of the United States Government within the Department of Health and Human Services, with offices at 10903 New Hampshire Avenue, Silver Spring, Maryland, as well as in the District of Columbia.

14.     Defendant Margaret A. Hamburg, M.D. is Commissioner of FDA and is FDA's senior official.  She is sued in her official capacity only.  Dr. Hamburg maintains offices at 10903 New Hampshire Avenue, Silver Spring, Maryland, as well as in the District of Columbia.

15.     Defendant Kathleen Sebelius is Secretary of Health and Human Services and the official charged by law with administering the FDCA.  She is sued in her official capacity only. Secretary Sebelius maintains an office at 200 Independence Ave., S.W., Washington, D.C.

## JURISDICTION AND VENUE

16.     This action arises under the FDCA and the APA, 5 U.S.C. §§ 505-596.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-2202.

17.     There exists an actual and justiciable controversy between Endo and Defendants requiring resolution by this Court.  Endo has no adequate remedy at law.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), as all Defendants have offices and regularly do business in this district and Defendant Sebelius has her principal office and place of business in this district.

## BACKGROUND

***The Need for Effective Pain Medications, the Problem of Abuse of Pain Medications, and FDA's Actions Regarding Development of Abuse-Resistant Alternatives***

19.     "Chronic pain affects about 100 million American adults – more than the total affected by heart disease, cancer, and diabetes combined."[2]  Many physicians seek to help relieve the suffering of their patients by prescribing opioid pain medications, including Opana® ER.

20.     FDA has *long* been aware that, although millions of Americans are being lawfully prescribed opioids and treated with opioids under the care and supervision of a qualified physician, the misuse and abuse of prescription pain relievers – particularly those that are able to be crushed into a fine powder and inhaled, with the expectation that the inhaled drug will produce a faster, more powerful euphoric effect (a "high") – has reached crisis levels over the

---

[2]     Institute of Medicine, *Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research* (June 29, 2011), http://www.iom.edu/Reports/2011/Relieving-Pain-in-America-A-Blueprint-for-Transforming-Prevention-Care-Education-Research/Report-Brief.aspx.

past decade.   FDA's sister public health agency, the Centers for Disease Control and Prevention, has reported:

> Although many types of prescription drugs are abused, there is currently a growing, deadly epidemic of prescription painkiller abuse. Nearly three out of four prescription drug overdoses are caused by . . . opioid pain relievers. The unprecedented rise in overdose deaths in the US parallels a 300% increase since 1999 in the sale of these strong painkillers. These drugs were involved in 14,800 overdose deaths in 2008, more than cocaine and heroin combined.[3]

21.    FDA is responsible "for protecting the public health by assuring the safety, efficacy and security" of drugs, and "for advancing the public health by helping to speed innovations that make medicines more effective, safer, and more affordable and by helping the public get the accurate, science-based information they need to use medicines and foods to maintain and improve their health."[4]

22.    In 2006, Congress stated that FDA "should take all appropriate steps to ensure that health care providers and patients are given all relevant information concerning the abuse-resistant qualities of safer drugs.  Providers and patients alike will benefit from the expedited review of safer drugs, as well as the provision of information that accurately differentiates abuse-resistant formulations."  H.R. Rep. No. 109-102 (2006).[5]

23.    In April 2010, FDA convened an Advisory Committee to address the abuse of prescription opioid pain relievers.   At that time, FDA stated that it was seeking "novel interventions" to prevent opioid abuse, "while maintaining the availability of these important drug products for the millions of patients in this country who suffer from chronic pain."[6]

---

[3]    Centers for Disease Control and Prevention, *Policy Impact: Prescription Painkiller Overdoses*, http://www.cdc.gov/homeandrecreationalsafety/rxbrief/.
[4]    FDA, *What We Do,* http://www.fda.gov/aboutfda/whatwedo/default.htm.
[5]    http://thomas.loc.gov/cgi-bin/cpquery/?&sid=cp109susc7&r_n=hr102.109&dbname=cp109&sel=DOC&.
[6]    Bob A. Rappaport, Director, Division of Anesthesia and Analgesia Products, Office of Drug Evaluation II, Center for Drug Evaluation and Research, FDA, Memorandum to the Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee, in advance of the joint committee

24.     FDA informed the Advisory Committee that it had "supported the development of novel formulations through multiple interactions with both the pharmaceutical industry and the academic community."   Rappaport, *supra* note 6.   FDA expressly noted, however, that "successful new formulations" of opioids had been "elusive, due to difficulties related to manufacturing, biopharmaceutical concerns and clinical failures in early studies."   Rappaport, *supra* note 6.[7]

25.     In the summer of 2010, FDA reviewed and commented on the reformulated OxyContin® (oxycodone HCl controlled-release).[8]   FDA acknowledged that the crush-resistant-formulation of OxyContin® made it "more difficult for people to defeat the controlled-release properties of the drug by cutting or crushing the tablets," which was, according to FDA, "a step in the right direction."[9]

26.     In 2011, the White House Office of National Drug Control Policy issued a Report that placed a priority on the "development of abuse-deterrent formulations (ADF) of opioid medications and other drugs with abuse potential."   *Epidemic: Responding to America's*

---

meeting held on April 22, 2010, 1 (March 26, 2010), *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/AnestheticAndLifeSupportDrugsAdvisoryCommittee/UCM209141.pdf.

[7]     FDA's inquiry did not involve crush-resistant opioid formulations, but rather focused on Acura Pharmaceutical company's inclusion of niacin in its oxycodone-based pain reliever, Acurox®, as an example; the niacin was intended to create an "unpleasant sensation of flushing when large quantities" of the drug were taken and greater irritation to the nose when snorted. *Id.* at 1-2.

[8]     OxyContin®, manufactured by Purdue Pharma LP, holds a much larger share of the opioid pain reliever market than Opana® ER.  The reformulation of OxyContin® was the subject of an extensive FDA Advisory Committee review and hearings.  In 2008, FDA stated that "Availability of a ER oxycodone product with reduced abuse liability is desirable." *History of OxyContin: Labeling and Risk Management Program*, Anjelina Pokrovnichka, M.D., FDA Medical Officer, Division of Anesthesia, Analgesia, and Rheumatology Products Office of Drug Evaluation II (November 2008), http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/AnestheticAndLifeSupportDrugsAdvisoryCommittee/UCM248776.pdf.

On July 13, 2012, Purdue filed a Citizen Petition asking FDA to, *inter alia*, announce guidance detailing the *in vitro* and *in vivo* tests that must be performed to demonstrate that generic forms of OxyContin "can be expected to perform as well as reformulated OxyContin when subjected to known and anticipated forms of tampering."   Citizen Petition No. FDA-2012-P-0760 (July 13, 2012), resubmitted as Citizen Petition No. FDA-2012-P-0939 (August 18, 2012).

[9]     FDA Patient Safety News, *New Formulation for OxyContin*, Show No. 99 (June 2010), http://www.accessdata.fda.gov/psn/transcript.cfm?show=99.

*Prescription Drug Abuse Crisis* at 4 (2011).[10]   The Report stated that FDA should "[p]rovide guidance to the pharmaceutical industry on the development of abuse-deterrent formulations and on post market assessment of their performance." *Id.*; *see also id.* at 10.

27.     On July 9, 2012, FDA approved a Risk Evaluation and Mitigation Strategy ("REMS") for extended-release/long-acting opioids, including Opana® ER, OxyContin®, and other drugs, stating that opioids "are highly potent drugs" and "the misuse and abuse of these drugs have resulted in a serious public health crisis of addiction, overdose, and death."[11]

28.     FDA recently acknowledged that "[t]he Agency may, in certain circumstances, determine that a previous drug formulation was withdrawn for reasons of safety following the introduction of a safer alternative."[12]

### Original Formulation of Opana® ER and Misuse and Abuse of Non-Crush-Resistant Opioids

29.     On June 22, 2006, FDA approved Original Formulation Opana® ER (NDA 21-610), an extended-release pain reliever containing oxymorphone HCl, a semi-synthetic opioid analgesic.  Oxymorphone is a Schedule II Controlled Substance.  The Controlled Substances Act defines Schedule II Controlled Substances as drugs that have "a high potential for abuse"  which may lead "to severe psychological or physical dependence."  21 U.S.C. § 812(b)(2).

30.     On or about July 24, 2006, Endo brought Original Formulation Opana® ER to market.

---

[10]     http://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/rx_abuse_plan.pdf.

[11]     FDA, *Risk Evaluation and Mitigation Strategy (REMS) for Extended-Release and Long-Acting Opioids*, http://www.fda.gov/drugs/drugsafety/informationbydrugclass/ucm163647.htm.   According to FDA: "The REMS is part of a multi-agency Federal effort to address the growing problem of prescription drug abuse and misuse [and] introduces new safety measures to reduce risks and improve safe use of ER/LA [extended- release/long acting] opioids while continuing to provide access to these medications for patients in pain." *Id.*

[12]     *See* Letter from FDA RE: Docket Nos. FDA-2011-P-0339 and FDA-2012-P-0507, at 5 n.11 (November 7, 2012), http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0507-0008.

31.     Original Formulation Opana® ER was available in 5 mg, 10 mg, 20 mg, and 40 mg strengths (and the product line was expanded in 2008 to include 7.5 mg, 15 mg, and 30 mg strengths).  FDA approved Original Formulation Opana® ER for use, by prescription, by patients suffering from moderate to severe pain requiring continuous around-the-clock opioid treatment for an extended period of time.

32.     FDA determined that Original Formulation Opana® ER was safe and effective when used properly and according to the indications on its label.  However, Original Formulation Opana® ER was subject to abuse or misuse in several ways that pose health risks to humans.  In particular, when the pills were crushed into a fine powder and inhaled or otherwise ingested (for example, through a feeding tube), the drug's potent active ingredient is released very quickly (rather than over an extended period of time, as intended) posing an overdose risk.

33.     Another potential risk posed by the crushable Original Formulation relates to chewing the drug.  Just as crushing extended-release pills rapidly releases the opioid, chewing also produces an accelerated release of the active ingredient.  This increased the likelihood of serious injury, particularly in children, as compared to ingestion of an intact extended-release pill.[13]

34.     At the time Opana® ER was introduced, other opioid pain relievers – including OxyContin® – were also on the market.  All of these opioid medications were subject to the risk of abuse or misuse.

---

[13]      *See generally* Bailey, J. et al., *The Underrecognized Toll of Prescription Opioid Abuse on Young Children*, Annals of Emergency Medicine, 2009; 53:419-24, http://www.cste.org/dnn/Portals/0/NTForums_Attach/Bailey%20et%20al%20Ann%20Emerg%20Med%202008%20In%20Press.pdf.

### *Development of Opana® ER CRF*

35.     Endo closely monitored how Original Formulation Opana® ER was used and misused after its release.  Approximately one year after the launch of the Original Formulation, Endo chose to address the abuse and misuse of the drug by negotiating and entering into a December 2007 agreement with a German company, Grunenthal GmbH ("Grunenthal"), to produce and license a crush-resistant formulation.

36.     In May 2009, before Endo filed an NDA for Opana® ER CRF, the company met with FDA to discuss the aims of Endo's reformulation of the drug, including thwarting abusers' efforts to defeat Opana® ER's controlled-release mechanisms.  As of that time, FDA had not provided any guidelines or criteria to gauge crush resistance; however, FDA acknowledged that even an incremental improvement over the non-crush-resistant formulation could be beneficial.

37.     On July 7, 2010, Endo submitted NDA No. 201655 to FDA for Opana® ER CRF. In a cover letter that accompanied its submission, Endo stated:

> As a pharmaceutical company with a focus on pain management, Endo
> Pharmaceuticals Inc. strives to improve the treatment of pain in patients
> while at the same time safeguarding against potential misuse, abuse,
> overdose, and addiction associated with use of its products. Improving
> pain management includes the development of new effective analgesics
> and also supporting the proper and appropriate use of its medication.

Letter from R. Barto to B. Rappaport, M.D., at 1 (July 7, 2010).  Endo advised FDA that Opana® ER CRF was designed to "reduce accidental misuse (*i.e.*, breaking, and/or crushing for patient convenience) and to deter certain methods of intended abuse (*i.e.*, crushing for snorting and/or injection)." *Id.*

38.     Opana® ER CRF is bioequivalent[14] of the Original Formulation of the drug, but the CRF version embeds the active ingredient, oxymorphone, in a polyethylene oxide matrix that

---

[14]     21 C.F.R. § 320.1 defines "bioequivalence" as:

makes the pill much harder than the Original Formulation.  Thus, the CRF version is resistant to crushing.  The Opana® ER CRF formulation also has properties that make it difficult to manipulate into a soluble form that could be easily drawn up in a syringe and subsequently injected by potential abusers.

39.    Endo concluded that Opana® ER CRF would reduce manipulation of the drug due to its resistance to crushing, breaking, pulverization, and powdering.  Endo asked that FDA grant a priority review of its NDA.  *See id.*

### The "Squeezing-the-Balloon Effect" Caused by the Launch of Crush-Resistant OxyContin®

40.    In the summer of 2010, before FDA approved Endo's NDA for Opana® ER CRF, and thus before Endo could produce and market Opana® ER CRF, Purdue launched a crush-resistant formulation of OxyContin® and discontinued its former non-crush-resistant formulation of the drug.  As the original formulation of non-crush-resistant Oxycontin® became increasingly difficult to procure, abusers turned to other non-crush-resistant opioid drugs because they were easier to crush.[15]  This is known as the "squeezing-the-balloon effect."

41.    As demonstrated in the chart that follows (which is based on data compiled by the Researched Abuse, Diversion, and Addiction-Related Surveillance System ("RADARS") from poison control reports of intentional exposure per 100,000 population), after crush-resistant OxyContin® (referred to in the chart as "ORF," and represented by the vertical line at 2010Q3)

---

the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study.

[15]    *See* Drug Enforcement Agency, Philadelphia Division Intelligence Program, *Drug Intelligence Brief: Opana (Oxymorphone) Abuse*, 3 (May 2011) ("Users are reportedly switching from Oxycontin to Oxymorphone for ease of use (crushable)."), http://www.docstoc.com/docs/83651887/DRUG-INTELLIGENCE-BRIEF.

was introduced in the third quarter of 2010, abuse and misuse of Opana® ER (represented by the solid black line) spiked dramatically, by 140%:



(As described in greater detail in ¶¶ 57-59, *infra*, the chart also demonstrates the rapid decline in abuse rates of Opana® ER in the second quarter of 2012 after introduction of Opana® ER CRF (represented by the vertical line at 2012Q1).)[16]

42.    FDA approved the NDA for Opana® ER CRF for marketing on December 9, 2011.

43.    Endo ceased manufacturing Original Formulation Opana® ER in February 2102 (shortly after receiving FDA approval for Opana® ER CRF) when the plant that produced

---

[16]    The dashed lines demonstrate the change in the average rate of abuse before the introduction of crush-resistant OxyContin (represented by the blue horizontal line) to the rate of abuse after the introduction of crush-resistant OxyContin (represented by the red horizontal line).

Opana® ER (run by another pharmaceutical company) encountered production problems.[17] Endo then accelerated the pace of its conversion to Opana® ER CRF. Endo worked with Grunenthal (even bringing workers from Grunenthal's German production facilities to the United States) to expedite production to accelerate the conversion.

44.     Endo did not recall the Original Formulation Opana® ER that already had been produced and distributed because of concerns that an abrupt recall would cause a drug shortage and place legitimate patients at risk (e.g., by causing them to suffer withdrawal symptoms or forcing them to switch to another drug that could produce side effects and/or prove less effective). The FDA agreed that abrupt withdrawal of the original formulation would pose a significant safety concern. Endo coordinated its activities with the agency to allow the existing supply of Original Formulation Opana® ER to be drawn down while Endo undertook a concerted effort to bring the crush-resistant-formulation to market as quickly as possible.

45.     Endo began shipping Opana® ER CRF in February 2012. Opana® ER CRF is available currently in 10 mg, 15 mg, 20 mg, 30 mg, and 40 mg strengths, and will soon be available in 5 mg and 7.5 mg strengths. Like the Original Formulation, Opana® ER CRF is prescribed to patients suffering from moderate to severe chronic pain, who require continuous around-the-clock opioid treatment for an extended period of time.

### Endo's Multiple Notices to FDA that Original Formulation Opana® ER Had Been Discontinued for Safety Reasons

46.     On May 31, 2012, Endo wrote to FDA, providing notice that Endo had discontinued marketing Original Formulation Opana® ER (NDA 21-610). Endo's notice stated:

> While the original formulation of OPANA ER (under NDA 21-610) was deemed by the FDA to be safe and effective when taken according to the

---

[17]     In March 2011, Endo made a business decision to discontinue the sale and distribution of Original Formulation Opana® ER in the 7.5 and 15 mg strengths. These low dosage forms were used primarily used for titration purposes (e.g., increasing dosages gradually) and were abused less often than the higher strength dosages.

> prescribing information, the original formulation was subject to both intentional and inadvertent abuse and misuse. Endo believes that the new formulation of OPANA ER (under NDA 201655), which is designed to be crush resistant, offers safety advantages over the original formulation (NDA 21-610) and that the original formulation (under NDA 21-610) should be discontinued for safety reasons.

Notice from Tara Chapman of Endo to FDA's Director of Drug Information, (May 31, 2012) (Chapman Dec. Ex. B).

47.     On or about June 14, 2012, after receiving Endo's May 31 Notice, FDA moved the Original Formulation of Opana® ER to the discontinued drugs list. To date, however, FDA has not made the determination that Original Formulation Opana® ER was withdrawn from sale for safety reasons, as required of FDA by the FDCA (21 U.S.C. § 355(j)(6)) and by FDA's own regulations (21 C.F.R. §§ 314.153(a)(3), 314.161(a)).

48.     In addition to the pathway created by 21 C.F.R. § 314.161(a)(1) & (2), which requires FDA to make a safety determination *sua sponte*, 21 C.F.R. § 314.161(a)(3) creates a second mechanism, a Citizen Petition, by which such a determination may be obtained. *See* 21 C.F.R. §§ 10.25(a),10.30. FDA must take agency action on a Citizen Petition relating to a pending drug application "not later than 150 days after the date on which the petition is submitted." FDCA § 505(q)(1)(F); (21 U.S.C. § 355(q)(1)(F)).

49.     In an effort to prod FDA into action to make its required withdrawn-for-safety determination, on August 10, 2012, Endo filed a Citizen Petition under FDCA §§ 505(j) and 505(q), and 21 C.F.R. §§ 10.30 and 314.161. FDA received the Citizen Petition on August 13, 2012.[18] In its Citizen Petition, Endo requested that FDA determine that Original Formulation Opana® ER was discontinued for reasons of safety, refuse to approve any pending ANDA for a

---

[18]     January 10, 2013 is 150 days from August 13, 2012.

generic version of the Original Formulation, and suspend and withdraw any approved ANDA referencing the Original Formulation as the RLD.  Chapman Dec. Ex.  C, at 1.

50.     In the Citizen Petition, Endo reiterated information it previously had submitted to FDA through its NDA, *i.e.,* that Opana® ER CRF offered resistance to crushing, which could deter abuse by recreational and experienced abusers attempting to crush the tablets, as well as offering resistance "in situations of misuse – for example, where patients or other healthcare providers attempt to crush tablets to facilitate swallowing or gastric tube administration, where patients intentionally or unintentionally attempt to chew the tablets to facilitate swallowing or where children unintentionally chew the tablets prior to an accidental ingestion." *Id.* at 4-5.

51.     In explaining why Original Formulation Opana® ER was withdrawn for safety reasons, Endo emphasized that "abuse of extended-release oxymorphone [such as Original Formulation Opana® ER] has risen by approximately 139% since the introduction of abuse-deterrent OxyContin® (oxycodone HCl) on the market in 2010." *Id.* at 7.

52.     Endo explicitly reminded FDA that it had approved two ANDAs for generic versions of Opana® ER, from Impax and Actavis, and that those ANDAs relied on the Original Formulation (NDA No. 21-610) as the RLD.  Endo informed FDA that it expected Impax to come to market with a non-crush-resistant generic formulation of Opana® ER (in all strengths) as early as January 1, 2013.  *Id.* at 5.[19]

53.     Endo concluded by asking FDA to "determine that Opana® ER was discontinued for safety reasons in light of Endo's intent in discontinuing Opana® ER and in light of the crush-resistance and attendant safety advantages provided by Opana® ER CRF in comparison to the original formulation."  *Id.* at 10.  Endo further asked FDA to "refuse to approve any pending

---

[19]     In June 2010, Endo entered into a Settlement and License Agreement with Impax Laboratories Inc. The agreement settled a patent dispute pending in the U.S. District Court for the District of New Jersey and granted Impax a license to sell a generic version of Original Formulation Opana® ER beginning January 1, 2013.

ANDA for a generic version of the drug and promptly move to suspend and withdraw the approval of any ANDA referencing Opana® ER [non-CRF] (NDA No. 021610) as the RLD." *Id.*

54.     On August 31, 2012, Endo filed a second Citizen Petition requesting that FDA: (1) require that any ANDA referencing Opana® ER CRF demonstrate that the proposed product is similarly crush-resistant to Opana® ER CRF; (2) classify crush-resistant extended-release opioids, such as Opana® ER CRF, as a new dosage form; and (3) confirm that any ANDA referencing the Original Formulation of Opana® ER will not be identified as therapeutically equivalent to Opana® ER CRF.  Chapman Dec. Ex. D, at 1-2.

55.     In this Petition, Endo once again stated its rationale for discontinuing the Original Formulation of Opana® ER, *i.e.*, for safety reasons.  *Id.* at 6   It also provided additional information (derived from the data that Endo had submitted to FDA in support of its NDA for Opana® ER CRF) demonstrating that Opana® ER CRF is more resistant to crushing, and thus less attractive to abusers who administer drugs by snorting.  *Id.* at 6-7.  The data presented showed that, whereas 96% of research subjects were willing to snort the Original Formulation (which could be crushed into a powder), only 11% of subjects were willing to attempt to snort the larger pieces of tablets that were produced when they attempted to crush Opana® ER CRF. *Id.* at 7-8; *see also id.* at 9-15.

56.     Thus, Endo submitted that, although the two formulations are bioequivalent, they do not have the same safety profile and, accordingly, should not be considered therapeutically equivalent.  *Id.* at 24-25, citing *Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book")*, Preface at viii.

57.     On November 13, 2012, Endo submitted a Supplement to its August 13 Citizen Petition ("Supplement," Chapman Dec. Ex. E).  In the Supplement, Endo provided six months' worth of recent data concerning abuse of Opana® ER gathered by NAVIPPRO and RADARS[20] after the February 2012 introduction of Opana® ER CRF.

58.     Endo advised FDA that surveillance data gathered after the February 2012 introduction of Opana® ER CRF demonstrates that the introduction of Opana® ER CRF has significantly reduced the abuse and misuse of the drug.  *See* Chapman Dec. Ex. E.  Specifically, six months' worth of data collected by NAVIPPRO after the introduction of Opana® CRF demonstrated a 59% reduction in abuse from Original Formulation Opana® ER.  *Id.* at 20.  Data from RADARS showed that, after the crush resistant formulation was introduced, reports of abuse and diversion of Opana® ER in poison centers and diversion programs dropped by 44% and 58%, respectively.  *Id.* at 7.  Both of these findings represent statistically significant differences compared with baseline rates prior to introduction of Opana® ER CRF.  (By contrast, prior RADARS data reflects that, after crush-resistant Oxycontin® was introduced in the third quarter of 2010, abuse reporting of the Original Formulation Opana® ER *rose* by approximately 140%.  *Id.* at 28.)

59.     Thus, the information set forth in the Supplement "indicates that the reformulated Opana® ER is having the desired effect," *i.e.*, reducing the rates of abuse of the product.  *Id.* at 1.

---

[20]     As part of the pharmacovigilance and risk management activities for Opana® ER, Endo subscribes to the National Addictions Vigilance Intervention and Prevention Program ("NAVIPPRO") and to RADARS.

NAVIPPRO is a national program that includes surveillance of substance abuse as well as prevention and intervention educational programs for substance abuse. NAVIPPRO surveillance involves analyses of multiple data sources for indicators of prescription medication abuse. Continuous examination of these data streams allows monitoring of trends over time for drug abuse at a product-specific level.

The RADARS System collects anonymous instances/reports of prescription drug abuse, misuse, and diversion for specific drug products occurring in communities as defined by ZIP codes.  Rates of abuse in each ZIP code are then calculated based upon population and drug availability.

60.     In this November 13, 2012 Supplement, Endo again stressed the need for FDA to make a prompt safety determination, stating: "Because of the urgency of the matter and the significant impact on public health, FDA must not delay any further in issuing its determination that the original formulation Opana ER was withdrawn from sale for safety reasons." *Id.*

61.     Endo also reiterated that a generic non-crush-resistant formula of Opana® ER is anticipated to launch on January 1, 2013, and that the data gathered suggest that "availability of these approved non-crush-resistant extended-release products will result in increases in drug abuse, misuse and diversion.  Serious and predictable public health harm would flow from the entry and continued sale of additional non-tamper-resistant versions of Opana ER." *Id.* at 2.

62.     Thus, Endo again urged FDA to act quickly and carry out its legal obligation to make a determination that Original Formulation Opana® ER was withdrawn for safety reasons and can no longer serve as a RLD for any ANDA applicants.  *See id.* at 2.

### FDA's Failure to Make a Withdrawn-for-Safety Determination Despite its Awareness of the Public Health Crisis Caused by Non-Crush-Resistant Opioid Pain Relievers

63.     FDA has not carried out its responsibility under 21 C.F.R. § 314.161(a) to make a determination *sua sponte* as to whether Endo discontinued Original Formulation Opana® ER for reasons of safety.  Moreover, FDA has not taken any action in response to either of Endo's Citizen Petitions or its recent Supplement that sought to prod the agency into fulfilling its statutory and regulatory obligations, triggered by Endo's May 31, 2012 Notice that it had withdrawn Original Formulation Opana® ER.

64.     FDA's own statements over the better part of a decade reflect that the agency is, and has been for many years, acutely aware of the public health risks posed by abuse and misuse of extended-release opioids, particularly abuse and misuse involving crushing the drugs into a

powder.  FDA has also acknowledged the significant resources that Endo has invested to develop a formulation for opioid pain relievers with safety features that deter misuse and abuse.

65.    In June 2012, a senior FDA official commented that "the status quo is not acceptable" and that "we must stem this tide of misuse, abuse, and death before it imperils future access to essential therapies for pain." Douglas C. Throckmorton, Deputy Director, Center for Drug Evaluation and Research, FDA, *FDA and Opioids: What's a Regulator to Do?*, 24 (June 14, 2012).[21]

66.    Further, just this month, on November 18, 2012, the director of non-profit Center for Lawful Access and Abuse Deterrence ("CLAAD") warned that powerful "pain medications without added safety features could flood back into communities in the coming weeks" unless FDA acts quickly.[22]  CLAAD Press Release, *Summit Yields One-of-a-Kind Opportunity to Reduce Prescription Drug Overdoses* (Nov. 16, 2012).[23]

67.    FDA nonetheless has failed and continues to fail to take the first step toward changing the status quo with respect to abuse of oxymorphone.  In response to Endo's May 31 Notice of discontinuation, FDA has failed to make the determination required by 21 C.F.R. § 314.161(a) as to whether Original Formulation Opana® ER was withdrawn from sale for safety reasons.  That delay is unreasonable, and presents a significant risk to the public health, because generic versions of Original Formulation Opana® ER will be marketed as soon as January 1, 2013.  The pattern of misuse and abuse that existed before Opana® ER CRF entered the market undoubtedly will be replicated and will accelerate upon introduction of a non-crush-resistant generic version of the Original Formulation.  This harm would be irreparable both to Endo and to

---

[21]    http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/UCM309381.pdf.

[22]    CLAAD states that its primary objective "is to coordinate a comprehensive national effort to prevent the diversion, misuse, and abuse of prescription medications while ensuring adequate medical care for patients in need." CLAAD, *Overview*, http://www.claad.org/about-claad/overview.

[23]    http://www.claad.org/component/content/article/124

the public health.  Once the non-crush-resistant drug has been distributed, it will be very difficult, if not impossible, to recall.  No subsequent action will cure the harm to those who misuse or abuse the drug introduced for sale based on a RLD that has been withdrawn for reasons of safety.  The potential serious risk of illness and death truly constitutes irreparable injury.

68.      Endo is harmed by FDA's failure to make the determination it is required to make.  The direct economic harm to Endo includes the loss of the benefit of its investment in developing Opana® ER CRF, the loss in sales of Opana® ER CRF if there is a lower cost generic product on the market that relies upon the withdrawn Original Formulation as its RLD, and the price erosion of Opana® ER CRF.

## CLAIMS FOR RELIEF

### Count I
### (Administrative Procedure Act: Violation of the FDCA)

69.      Paragraphs 1 through 68 are incorporated herein by reference.

70.      The FDCA requires FDA to withdraw or suspend approval of any ANDA with a RLD that "has been withdrawn from sale for safety . . . reasons."  21 U.S.C. § 355(j)(6).

71.      Despite having known for many years that non-crush-resistant extended-release opioid pain relievers pose particular dangers to health and safety due to their potential for abuse and misuse; despite having received Notice on May 31, 2012 that Endo had discontinued Original Formulation Opana® ER (NDA No. 21-610) for reasons of safety and introduced the safer, reformulated Opana® ER CRF; and despite being aware that a generic non-crush-resistant formulation of Opana® ER has been approved and is scheduled to come to market on January 1, 2013, absent FDA action, the agency has breached its clear statutory duty to make a determination that Original Formulation Opana® ER was withdrawn from sale for safety

22

reasons, and FDA has similarly failed to carry out its statutory duty to withdraw or suspend the approval of any ANDA that cited Original Formulation Opana® ER as the RLD.

72.     Unless FDA acts before January 1, 2013, the launch of a generic non-crush-resistant Opana® ER will harm the public interest and undermine recent progress in the reduction of abuse and misuse of oxymorphone, and otherwise lead to irreparable harm, including serious injury or death of abusers or misusers.

73.     Unless FDA acts before January 1, 2013, the spike in misuse and abuse that will occur after the introduction of a generic non-crush-resistant formula of Opana® ER, and the attendant increase in addiction and overdoses, will not only lead to increased injuries or deaths but will also irreparably injure Endo economically and injure Endo's reputation and goodwill. Endo's brand will be associated with the harmful effects caused by the generic version of the drug, due to FDA's failure to carry out its legal obligation.

74.     Based on FDA's record of inaction to date, there is no reason to believe that FDA will act before January 1, 2013, unless the Court orders FDA to do so.

75.     Endo is harmed by FDA's failure to satisfy its legal obligation under its rules to make a timely determination that Original Formulation Opana® ER was withdrawn for safety reasons.

76.     FDA's failures constitute an agency action unlawfully withheld or unreasonably delayed in violation of the FDCA.

### Count II
### (Administrative Procedure Act: Violation of FDA Regulations)

77.     Paragraphs 1 through 68 are incorporated herein by reference.

78.     FDA's regulations require the agency to suspend approval of an ANDA where FDA determines "that the abbreviated application is suspended because the listed drug on which

the approval of the abbreviated new drug application depends has been withdrawn from sale for reasons of safety . . ." 21 C.F.R. § 314.153(a)(3).

79.    FDA's regulations also require the agency to determine, on its own initiative, "whether a listed drug that has been voluntarily withdrawn from sale was withdrawn for safety or effectiveness reasons . . . at any time after the drug has been voluntarily withdrawn from sale," before "approving an abbreviated new drug application that refers to the listed drug" or "[w]henever a listed drug is voluntarily withdrawn from sale and abbreviated new drug applications that referred to the listed drug have been approved." 21 C.F.R. § 314.161(a).

80.    Despite having known for many years that non-crush-resistant extended-release opioid pain relievers pose particular dangers to health and safety due to their potential for abuse and misuse; despite having been on formal Notice since May 31, 2012 that Endo had discontinued Original Formulation Opana® ER (NDA No. 21-610) for reasons of safety and introduced the safer, reformulated Opana® ER CRF; despite being aware that a generic non-crush-resistant formulation of Opana® ER has been approved and is scheduled to come to market on January 1, 2013 absent FDA action, the agency has breached its clear duty under its own rules to make a timely determination as to whether Original Formulation Opana® ER was withdrawn from sale for safety reasons.  It also has failed to withdraw or suspend the approval of any ANDA citing Original Formulation Opana® ER as the RLD, as required by 21 C.F.R. § 314.161(a).

81.    Unless FDA acts before January 1, 2013, the launch of a generic non-crush-resistant Opana® ER will harm the public interest and irreparably undermine recent progress in the reduction of abuse and misuse of oxymorphone, and otherwise lead to irreparable harm, including serious injury or death of abusers or misusers.

82.     Unless FDA acts before January 1, 2013, the spike in misuse and abuse that will occur after the introduction of a generic non-crush-resistant formula of Opana® ER, and the attendant increase in addiction and overdoses, will irreparably injure Endo economically as well as injuring Endo's reputation and goodwill.  Endo's brand will be associated with the harmful effects caused by the generic version of the drug, due to FDA's failure to carry out its obligations under its own regulations.

83.     Based on FDA's record of inaction to date, there is no reason to believe that FDA will act before January 1, 2013, unless the Court orders FDA to do so.

84.     Endo is harmed by FDA's failure to satisfy its legal obligation under its own regulations to make a timely determination that Original Formulation Opana® ER was withdrawn for safety reasons.

85.     FDA's failure to determine that Original Formulation Opana® ER was withdrawn for safety reasons and suspend approval of all ANDAs citing Original Formulation Opana® ER as the RLD (under NDA 21-610) constitutes an agency action unlawfully withheld or unreasonably delayed in violation of FDA's regulations and the APA.

### Count III
### (Administrative Procedure Act:
### Agency Action Unlawfully Withheld or Unreasonably Delayed)

86.     Paragraphs 1 through 68 are incorporated herein by reference.

87.     FDA has unlawfully withheld and unreasonably delayed making its mandatory determination as to whether Original Formulation Opana® ER was withdrawn from sale for safety reasons, and its failure to act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of  5 U.S.C. § 706(1) & (2).

88.     Under the FDCA (21 U.S.C. § 355(j)(6)) and FDA's regulations (21 C.F.R. § 314.161(a)(1), (2)), the agency is required to make a determination on its own initiative, once it

has been notified that a drug was withdrawn, whether it was withdrawn for reasons of safety, and, upon making such determination, to suspend or withdraw all approved ANDAs that refer to the withdrawn drug as the RLD.

89.    Endo notified FDA on May 31, 2012, that it had withdrawn Original Formulation Opana® ER from sale for reasons of safety.  Despite having been on notice for six months, FDA has not made that determination.

90.    FDA also received Notice from Endo that a generic version of the Original Formulation will be introduced on January 1, 2013.  FDA knows from its own experience and public statements, and from the data submitted by Endo, that the public health will be harmed substantially by introduction of a generic version of non-crush-resistant Original Formulation Opana® ER.  Yet, FDA has taken no action to carry out its legal obligation before a generic version of Original Formulation Opana® ER is introduced.  Given that Notice and the imminent introduction of a drug that refers to the withdrawn Original Formulation as the RLD, FDA's delay in making the required determination is unreasonable under the circumstances.

91.    FDA's withholding of this decision and its failure to act within a reasonable period of time violate the FDCA, the agency's own regulations, and the APA, and are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

92.    FDA's inaction and withholding of its decision harms and injures Endo, economically and otherwise, and poses public health and safety risks.

## PRAYERS FOR RELIEF

WHEREFORE, Endo requests that this Court issue a declaratory judgment, declaring the rights and obligations of the parties, including a declaration that Defendants have acted unlawfully in failing to make a determination as to whether Original Formulation Opana® ER was withdrawn for reasons of safety, and issue the following relief:

1. pending the final adjudication of this matter, that the Court grant all necessary and appropriate interim and preliminary mandatory, declaratory, and injunctive relief to protect the Plaintiff's interests and those of the public;

2. that the Court grant Plaintiff's motion for a preliminary injunction and all the relief requested in that motion (Plaintiff's motion is filed contemporaneously with the filing of this Complaint);

3. that the Court issue an order in the nature of mandamus requiring FDA to determine forthwith and without further delay and, in any event, by no later than December 31, 2012, whether Endo withdrew Original Formulation Opana® ER for safety reasons;

4. that the Court issue an order requiring FDA to suspend approval of any ANDAs citing Original Formulation Opana® ER as the RLD until FDA makes the required safety determination with respect to the withdrawal of Original Formulation Opana® ER, and further requiring FDA to pursue the subsequent procedures required by its regulations, including making such suspension final if FDA determines that Opana® ER was withdrawn for safety reasons; and

5.  that the Court grant such other, further, and additional relief as this Court may deem just
    and proper.

                    Respectfully submitted,


                    __/s/ David W. Goewey _____
                    Ralph S. Tyler (D.C. Bar No. 357087)
                    David W. Goewey (D.C. Bar No. 414257)
                    Meredith L. Boylan (D.C. Bar No. 978088)
                    VENABLE LLP
                    575 7th St., NW
                    Washington, D.C.
                    Tel. 202.344.4000
                    Fax 202.344.8300
                    rstyler@venable.com
                    dwgoewey@venable.com
                    mlboylan@venable.com

                    *Attorneys for Plaintiff Endo Pharmaceuticals Inc.*

November 30, 2012